IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

AMY KRCHMAR,                                )
                                            )
            Plaintiff,                      )
                                            )
vs.                                         )        Case No. 12-cv-5-TLW
                                            )
CAROLYN W. COLVIN,[1]                       )
Acting Commissioner                         )
of the Social Security Administration,      )
                                            )
            Defendant.                       )

## OPINION AND ORDER

Plaintiff Amy Krchmar requests judicial review pursuant to 42 U.S.C. § 405(g) of the

decision of the Commissioner of the Social Security Administration ("Commissioner") denying

plaintiff's applications for disability insurance benefits and supplemental security income under

Titles II and XVI of the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3),

the parties have consented to proceed before a United States Magistrate Judge. (Dkt. # 11). Any

appeal of this order will be directed to the Tenth Circuit Court of Appeals.

Plaintiff appeals the decision of the Administrative Law Judge ("ALJ") and asserts that

the Commissioner erred because the ALJ incorrectly determined that plaintiff was not disabled.

For the reasons discussed below, this Court AFFIRMS the decision of the Commissioner.

## Procedural History

On June 23, 2006, plaintiff filed applications for disability insurance benefits and

supplemental security income benefits under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 216(i), 223(d), and 1614(a)(3)(A). Plaintiff alleges disability due to arthritis, back

---

[1] Effective February 14, 2013, pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

pain, migraines, and bi-polar disorder beginning June 6, 2006. (R. 18, 161). After being denied benefits, plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ") on July 3, 2008. The ALJ conducted a hearing on June 8, 2009. (R. 43-68). On February 22, 2010 the ALJ issued his decision, denying benefits. On April 19, 2010, plaintiff appealed this decision to the Appeals Counsel. (R. 5-12). The Appeals Council upheld the ALJ's decision and denied plaintiff's request for review on December 2, 2011. (R. 1-4). The decision of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481. On January 9, 2012, plaintiff timely filed the subject action with this Court. (Dkt. # 2).

## Standard of Review and Social Security Law

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the Court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence and

whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a).

## Background

Plaintiff was born on October 29, 1973 and was 35 years old at the time of her hearing before the ALJ. (R. 33, 49). She completed one year of college, and obtained vocational training in data entry and medical secretarial work. (R. 169). Plaintiff held 17 jobs from March 1989 through September 2005. (R. 172). She worked as a cashier (SVP 3, light exertion), a deli worker (SVP 2, light exertion), a fast food cashier (SVP 2, light exertion), a delivery driver (SVP 2,

3

medium exertion), and a data entry worker (SVP 5, light exertion). (R. 63-64). Plaintiff alleges a disability onset date of September 27, 2004. (R. 16). Plaintiff never married and currently lives with her two children. (R. 120, 122). She is 5'5" and 220 pounds. (R. 161). Plaintiff alleges disability due to "back pain, migraines, bi-polar, [and] arthritis." Id. According to plaintiff's May 26, 2009 medication list, she is prescribed lithium (bi-polar disorder), Celexa (depression), Inderal (nightmares), Nuerontin (nerve pain), morphine (back pain), Oxycontin (back pain), Vistaril (anxiety), Amacyl (diabetes), and Metformin (diabetes). (R. 273).

**Hearing testimony**

At the June 8, 2009 hearing, plaintiff testified that she received help from family and friends in caring for her two young children and keeping up her apartment. (R. 50). She stated that she receives this assistance at least twice a week and that the remaining time her children "pretty much have to fend for themselves." (R. 50). She claimed "bi-polar, depression, anxiety, PTSD, ADD[,] OCD," "ruptured discs" in her back, and "arthritis" as the reasons she cannot work. (R. 51). Plaintiff said sleeps at least 12 hours a night, and naps three to five hours daily, yet has no energy. Id. She stated her depression leaves her with "no desire to participate socially or be in any family activities." Id. She claimed not to know why she has PTSD, then stated it was because her father "sexually molested" her when she was in high school. (R. 52). She said her parents remain married, and the abuse makes it "difficult to be around [her] family." Id.

Plaintiff discussed difficulty with housework, difficulty walking due to pain while shopping, and problems with compulsive spending. She said she feels "like [she] [i]s hoarding or something." (R. 52-53). She claims she can stand or walk approximately 15 to 20 minutes before needing to sit and rest due to pain, sit "probably about a half an hour or so," and lift "maybe 30

pounds." (R. 53). She claims that she rests 75 percent of the day.[2] Id. She also mentioned trouble concentrating, zoning out, not paying enough attention to her children, and being overwhelmed by tasks. (R. 53-56).

Plaintiff admitted that she tore her ACL while dancing at her brother's wedding. (R. 57). She said she has "two friends," but she argues with them and does not interact with them often due to "low energy and low interest in being with my friends and doing any activities." Id.

The ALJ next heard testimony from plaintiff's therapist, Premadonna Braddock. Ms. Braddock began treating plaintiff in June 2006. (R. 58). Ms. Braddock saw plaintiff until October 2006, and again from May 2007 through the date of the hearing.[3] (R. 59). Ms. Braddock testified that she witnessed plaintiff suffer a panic attack "several times." Id. She said that plaintiff's panic attacks can be triggered if plaintiff "feels that she's going to be alone." (R. 60). Ms. Braddock testified that plaintiff's home was "disorganized, deplorable," and "[m]ildly speaking it was a very bad condition, poor living conditions." Id. She stated "low motivation, low energy, … feeling helplessness, … a lot of severe sadness and sleeping" were all depression symptoms which contributed to the condition of plaintiff's home. Id. Ms. Braddock said plaintiff was often in her pajamas for sessions, seemed "zoned out," "numb," and as though she were on "autopilot." (R. 60-61). Ms. Braddock alleged that she observed plaintiff act socially withdrawn

---

[2] The ALJ noted in his decision that plaintiff "emphasized the date of December 2006 as a critical date on which her condition changed or deteriorated (see e.g., Exhibits 37F – purporting to pertain to a period after December 2006, and Exhibit 40F – purporting to pertain to a period before December 2006). However, the evidence adduced at the hearing did not support a deviation in the evaluation of the evidence before or after that date and nothing indicates that the date of December 2006 marks any intervening event in the claimant's physical or mental condition." (R. 33). In fact, plaintiff's counsel primarily directed her questioning toward the time period prior to December 31, 2006. Plaintiff's attorney likely stressed plaintiff's condition prior to December 2006 due to the insured date for her Title II application. The evidence supports the ALJ's conclusion regarding the December 2006 date.

[3] Ms. Braddock testified her husband was deployed to Germany during the time she stopped seeing plaintiff, and plaintiff was seen by another therapist during Ms. Braddock's absence.

with friends and said plaintiff suffers "severe PTSD," and that plaintiff's condition had remained level since December 2006. (R. 61-62).

The ALJ then posed two hypotheticals to the vocational expert: (1) an individual of plaintiff's age, education, and vocational background, limited to sedentary work "as described by the Commissioner," to include the ability to "occasionally lift and carry ten pounds, frequently lift and carry up to ten pounds, stand and/or walk at least two hours of an eight-hour workday, and sit at least six hours of an eight-hour workday," and further limited to "simple, repetitive tasks and incidental contact with the public." (R. 64); and (2) an individual whose characteristics and behaviors are consistent with plaintiff's testimony. (R. 65). The vocational expert opined that the first individual could not perform any of plaintiff's past relevant work but could perform the unskilled jobs of assembly worker (DOT number 732.684-062), miscellaneous labor worker (DOT number 715.687-086), and "different types of inspecting and checker jobs" (DOT number 716.684-030). (R. 65). The vocational expert opined that the second individual could not perform any competitive work. Id.

## **Medical records**

Plaintiff's medical records are extensive. She sought treatment from many different providers from July 2004 through October 2009, and often times she saw different providers for the same or similar ailments. (R. 294-303, 304-29, 330-45, 346-55, 356-61, 362-70, 371-78, 379-92, 393-400, 401-14, 431-33, 434-54, 455-513, 514-24, 525-30, 531-39, 540-73, 574-604, 605-07, 608-26, 627-52, 653-56, 657-78, 679-700, 701-02, 703-04, 705-08, 709-27, 728-32, 733-36, 737-43). A review of her medical history, although lengthy, is helpful to understanding the ALJ's decision here.

Plaintiff visited Family Medical Care of Tulsa (FMC) on July 2, 2004. She told FMC that she had recently been diagnosed with ADHD by therapist Jane Waters,[4] and she requested medication. (R. 321). She was placed on Strattera and instructed to return in two weeks. Id. During an August 9, 2004 visit, plaintiff complained that Strattera was not controlling her symptoms, so her prescription was changed to Adderall.[5] (R. 318).

In September, 2004, plaintiff was involved in a motor vehicle accident in which she suffered a knee injury. After the accident, plaintiff also complained of neck and back pain. During a follow up visit to FMC for her medications on October 4, 2004, plaintiff "incidentally" reported involvement in the September motor vehicle accident, and she requested a non-narcotic pain reliever for "breakthrough pain." She was given Ultram and encouraged to use a prior prescription of Motrin for pain and inflammation. (R. 316). Plaintiff visited David A. Traub, M.D. on October 12, 2004, regarding the accident. She was assessed with hyperextension injuries to the neck, mid back, and low back, blunt trauma to the right knee, and headaches that were secondary to her neck injury. (R. 303). Dr. Traub prescribed Lodine (for inflammation), Flexeril (a muscle relaxer), Lortab (5mg, for pain), and continued therapy with "Dr. Taylor." Id. Plaintiff received MRIs of the cervical and lumbar spines on October 19, 2004, which revealed protruding discs at L4-5 and L5-S1. (R. 300-02).

During a visit to FMC on November 2, 2004, plaintiff reported that her neck pain was improved and that her depressive and anxiety symptoms were improved with her current medications. (R. 315). On November 23, 2004, plaintiff told Dr. Traub that her back and neck pain were improving and that she believed therapy was helping. (R. 299). Plaintiff received an epidural steroid injection on December 14, 2004, which resolved her lower lumbar pain, but she

---

[4] The undersigned cannot locate any treatment records from Jane Waters in the record.

[5] A note that plaintiff is to continue Buspar and increase Lexapro to 20 mg, both to treat anxiety, is included in this visit, with no prior discussion in the treatment notes from FMC. (R. 318).

still experienced upper lumbar and thoracic spine pain. Dr. Traub advised plaintiff to continue "to work the muscles in physical therapy." (R. 297). On February 3, 2005, Dr. Traub reiterated that plaintiff suffered a "central protrusion and ruptured disc at L4-5 as well as central protrusion at L5-S1," as a "direct result of trauma sustained during the car wreck that occurred on 9-29-04."[6] Dr. Traub recommended another steroid injection. (R. 295).

An examination at FMC on February 14, 2005, showed plaintiff had a normal gait, had no anxiety or depression, had normal reflexes, and had a full range of motion in all joints with normal joints and muscles. (R. 312). She requested a "drug holiday" due to side effects.[7] Id. Records from Dr. Traub end on April 14, 2005, when plaintiff returned for a follow up exam and requested to be released from his care. Dr. Traub informed plaintiff she could return to see him if her back pain worsened. (R. 294). She did not return to Dr. Traub.

On June 7, 2005, plaintiff returned to FMC. During the visit, plaintiff had full range of motion in all joints and normal gait. (R. 306). Plaintiff complained of a headache and was advised to use over the counter medications. (R. 305).

Plaintiff visited Good Samaritan Health Services on August 6, 2005, complaining of back pain associated with her September, 2004 car accident. (R. 335). The treatment notes indicate that plaintiff "joined [a] gym" and began a new job on August 5, 2005. Id. But, a patient registration form dated September 17, 2005, notes that plaintiff was unemployed. (R. 338).

On September 17, 2005, plaintiff returned to Good Samaritan Health Services with complaints of ear popping and aching in her left knee. (R. 343). She returned on September 27,

---

[6] It is unclear whether Dr. Traub's statements are directed to someone reviewing plaintiff's accident or to plaintiff. Dr. Traub only ordered one MRI, and he discussed the results with plaintiff on this visit and during a visit on October 27, 2004.

[7] The treatment notes do not establish whether or not plaintiff was removed from medications after her request for a "vacation," but later notes show plaintiff continuing to take prescription medications.

2005, complaining of migraines and requesting a medication check. She was prescribed Imitrex for her migraines. (R. 344). Plaintiff returned on October 15, 2005, with complaints of allergic reactions to Imitrex and sinus problems. She was given penicillin and another prescription for headaches and was seen again November 19, 2005, for medication refills. (R. 343, 345).

On December 7, 2005, plaintiff went to the St. Francis emergency room complaining of a migraine. (R. 353). She was given medication and discharged. (R. 354).

Plaintiff next visited G. M. Anklesaria, M.D. at Crest Care Family Medicine on April 14, 2006, again complaining of migraines. (R. 361). Dr. Anklesaria ordered a CT scan of plaintiff's head and directed her to keep a diary of her headaches. Id. The results of the CT scan (taken on April 17, 2006) were normal. (R. 351).

Plaintiff was next seen at Good Samaritan Health Services on May 20, 2006 complaining of nausea, a pounding heart, and pressure in her head. (R. 345). The records indicate that plaintiff had been "standing/working in [the] heat for 4-6 hours." Id. She was diagnosed with heat exhaustion. Id. She returned to Dr. Anklesaria on June 6, 2006 for a follow up visit regarding her headaches and to address a complaint of depression. Plaintiff requested medication for depression at this visit. (R. 359). Dr. Anklesaria recommended counseling and psychological testing. Id.

Plaintiff visited Ms. Braddick at Creoks Mental Health Services on June 9, 2006. Ms. Braddick's initial assessment was positive, indicating plaintiff wanted to feel better about herself and obtain better parenting skills; Ms. Braddick wrote that plaintiff's prognosis was "good." (R. 453).

Seth Nodine, M.D., performed a physical consultative examination of plaintiff on September 13, 2006. Plaintiff denied tobacco use, alcohol use, or illegal drug use. (R. 364). Dr. Nodine noted plaintiff's grip strength to be 5/5 bilaterally, negative Rhomberg and Babinski

tests, negative straight leg raise testing bilaterally in both the seated and supine positions, adequate finger to thumb opposition, adequate fine tactile manipulation, and a normal and steady gait without assistive devices. (R. 365). His assessment was bipolar disorder, chronic lower back pain, and migraine headaches "which she states began after a MVA." Dr. Nodine noted plaintiff's statement "that pain and headaches are improved with the medications as listed above but she continues to have recurrence." Id. Dr. Nodine listed slight reductions in plaintiff's range of motion in her back and neck, but all remaining points were within normal limits. (R. 366-68).

On September 21, 2006, Denise LaGrand, Psy.D., performed a psychological consultative examination. (R. 372-78). Plaintiff told Dr. LaGrand she applied for Social Security disability benefits based on "depression, lack of interest, Bipolar disorder, mood swings, social phobias, fear of death, OCD, ADD, ADHD, loss of motivation or desire to function, feeling overwhelmed, stress, frustration, panic attacks, and physical problems." Plaintiff said that her psychological problems began after a miscarriage in 1998, and her physical problems began in 2004. Plaintiff reported treatment from Dr. Bumgardner at Creoks Mental Health Services for depression, bi-polar disorder, anxiety, OCD, ADD and panic attacks once a month, with her last visit on August 23, 2006.[8] Plaintiff also reported treatment at various mental health facilities since 2002. (R. 372). At the time of her visit with Dr. LaGrand, plaintiff took eight different medications, all except Celexa for her physical problems. Plaintiff stated that she was compliant with her medications, but "occasionally forgets." Id. No mental health records were provided to Dr. LaGrand.

Plaintiff told Dr. LeGrand that she had used marijuana, amphetamines, crack cocaine, and Ecstasy in the past, but last used any of these drugs in 2000. Plaintiff reported that she last used

---

[8] Although plaintiff stated to Dr. LaGrand she was receiving care from Dr. Bumgardner at Creoks Mental Health Services, there is a gap in plaintiff's treatment records from any provider from June 2006 to November 2006.

alcohol in December 2005, that she had used prescription medication that was not hers in the past, and that she had lost relationships due to substance abuse. (R. 374). Dr. LaGrand noted that plaintiff drove herself to the exam and was appropriately dressed and groomed. Id. Dr. LaGrand saw no noticeable physical handicaps, plaintiff's posture and gait were normal, and she did not appear to be in any pain. Id. Dr. LaGrand noted no memory or focus problems during the examination, and she noted that her thought content was appropriate. Id. Dr. LaGrand also noted no indications of active psychotic thought processes.

Dr. LaGrand gave plaintiff the following Axis diagnosis: Axis I, Bipolar II disorder; Axis II, no diagnosis; Axis III, deferred; Axis IV, occupational problems; and Axis V, 55. Dr. LaGrand opined plaintiff had a "fair chance for improvement in her condition" with adequate treatment, to include "counseling, parenting, [sic] and appropriate psychotropic medications." (R. 377). Dr. LaGrand believed plaintiff to be open and honest and believed the test results to be a valid estimate of plaintiff's overall functioning. Id. Dr. LeGrand believed that plaintiff would be able to handle her own funds if awarded benefits. She also found that plaintiff's ability to perform in most job situations was "low average." Id.

On October 5, 2006, Karen Kendall, Ph.D., completed a non-examining agency Psychiatric Review Technique form regarding plaintiff based on the record. Dr. Kendall opined that plaintiff's mental impairments were not severe. (R. 379). She noted that plaintiff suffered bipolar disorder and rated plaintiff's degree of limitation to be mild in restriction of activities of daily living, difficulties maintaining social function, and difficulties maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 382, 389). Dr. Kendall based her evaluation on the medical records and consultative examination results. (R. 391).

On October 11, 2006, Kenneth Wainner, M.D., an agency physician, completed a non-examining Physical RFC form regarding plaintiff based on the record. (R. 393-400). Dr. Wainner

assessed plaintiff with the RFC to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about six hours of an eight-hour day, and sit for about six hours of an eight-hour day. He did not limit plaintiff's push and pull except as shown for lift and/or carry. (R. 394). Dr. Wainner relied on plaintiff's medical records, and limited her to occasional climbing of a ramp, stairs, ladder, rope, or scaffolds, and kneeling. (R. 395). No manipulative, visual, communicative, or environmental limitations were imposed. (R. 396-97). Dr. Wainner noted: "[t]he severity of symptoms appears to vary greatly and clearly there are period[s] where LBP [low back pain] is not a significant problem. Observations of psych CE are pertinent as well as many outpatient visits without [complaint of] LBP and she is not fully credible." (R. 398).

On November 6, 2006, plaintiff voluntarily checked herself into St. Francis Laureate Psychiatric Center. Plaintiff sought treatment for depression and suicidal ideation. (R. 403-414). Plaintiff related her symptoms, denied drug use, said she smokes a pack of cigarettes a day, and stated she rarely used alcohol. (R. 403, 409). She was initially diagnosed with the following Axis: Axis I, major depressive disorder recurrent-severe without psychotic features, panic disorder with agoraphobia, and post-traumatic stress disorder; Axis II, deferred; Axis III, back pain; Axis IV, financial, interpersonal, support, and employment; and Axis V, current GAF 29. (R. 405). The doctor noted that plaintiff was motivated and willing to receive treatment. Id.

During her examination at Laureate, plaintiff complained of chronic back pain that was "currently stable," and she denied claudication (limping), joint pain, swelling, syncope, headaches, weakness, loss of sensation, dizziness, or vertigo. (R. 409). Plaintiff's November 17, 2006, discharge summary report characterized plaintiff as calm and cooperative, with a "better" mood, appropriate affect, no suicidal or homicidal ideations, no hallucinations, and good insight and judgment. (R. 411). On discharge, plaintiff's Axis was essentially unchanged, except that her

GAF had improved to 50. Her prognosis was listed as good, and she was released to her own care with adjusted medications and a safety plan, with no limits on physical activity. (R. 412). Her aftercare plan included following up with Dr. Joyce Baumgardner at Creoks on November 29, 2006, and with DVIS (Domestic Violence Intervention Services) on November 30, 2006. Id.

Plaintiff visited Shashi Husain, M.D. of Tulsa Neurology and Headache Clinic, on December 26, 2006, with complaints of back pain and headaches. (R. 539). Dr. Husain noted "Power" was 5/5, reflexes "2+," straight leg raise testing was negative, gait was normal, Romberg testing was negative, rapid alternating movements "were equal and well coordinated," and her finger to nose test was normal. Id. Dr. Husain ordered an EMG on January 2, 2007 to "rule out radiculopathy versus neuropathy." (R. 538). The results were normal.

On February 13, 2007, James Valdez of Creoks Behavioral Health Services wrote a letter on plaintiff's behalf to Legal Aid of Tulsa asking that plaintiff receive assistance in obtaining legal services to "address[] issues related to social security benefits" due to her diagnosis of bi-polar disorder.[9] (R. 542).

On February 23, 2007, plaintiff went to the St. Francis Hospital emergency room complaining of left calf leg pain and numbness, pain with walking, and swelling in her left ankle. The emergency room doctor diagnosed plaintiff with deep vein thrombosis in her left calf. (R. 509). However, when plaintiff was tested for this ailment on February 25, 2007, the results were negative. (R. 500). Dr. Anklesaria ordered an x-ray of plaintiff's left knee which was performed on February 28, 2007. The results were normal. (R. 496).

On February 3, 2007, plaintiff went to Good Samaritan Health Services complaining of left knee pain. Her left knee was imaged (MRI) on April 26, 2007. The MRI showed a "small

---

[9] A subsequent letter from Ms. Braddick written on June 26, 2008 states Mr. Valdez "had to help Amy request additional time to file her first appeal. Without James' assistance, Amy simply could not have completed the first appeal." (R. 541).

effusion" with no other abnormalities. (R. 720). The doctor refilled plaintiff's prescriptions and referred her to an orthopedist. (R. 717). She returned to Good Samaritan at least once a month through January 17, 2009 for complaints ranging from pain in her left knee to persistent coughs. (R. 710-716). Plaintiff requested a refill of her Coumadin prescription, even though it was not prescribed to her by physicians at Good Samaritan. (R. 716). She was advised to follow up with Dr. Anklesaria to obtain any refills of Coumadin.

On March 1, 2007, plaintiff went to the emergency room at St. Francis Hospital with chest pain. She was admitted for observation and testing, and the doctors determined that her chest pain was likely due to psychiatric conditions. (R. 460). Plaintiff was discharged on March 2, 2007, with instructions to continue her current medications and "resume her normal activities as tolerated." Id.

On May 18, 2007, Janette Fischer, MS and Elanie Thompson, LPC wrote a letter stating that plaintiff had received counseling services from them beginning March 6, 2007,[10] that plaintiff had attended four appointments since that time, and that plaintiff's testing indicated severe depression and severe PTSD symptoms. (R. 515).

During visits in February, March, and December 2007, and January 2008, Dr. Husain recorded either no new findings or normal findings during his physical examinations of plaintiff. (R. 532, 533). Notes from Dr. Anklesaria from June 14, 2007 through July 1, 2007, while difficult to read, seem to indicate that plaintiff was taking Coumadin (a blood thinner), but the notes do not indicate why. (R. 526). On June 25, 2007, agency physician Thurma Fiegel, M.D. completed another physical RFC for plaintiff. (R. 517-524). Dr. Fiegel did not deviate from Dr. Wainner's November 2006 physical RFC findings.

---

[10] The letter is dated March 6, 2006, but the undersigned believes this date is in error since her intake form is dated March 6, 2007. (R. 662).

Plaintiff returned to Dr. Anklesaria in August 2007 for deep vein thrombosis in her lower leg. The examination was unremarkable, but plaintiff continued to use Coumadin. (R. 604). She returned in October 2007, and received a diagnosis of adult onset diabetes. (R. 603). Dr. Anklesaria gave her medication and advised her to lose weight. In November 2007, Dr. Anklesaria recommended diabetes education classes, exercise, and medication. (R. 602). Plaintiff returned to Dr. Anklesaria in January 2008 for a physical. (R. 600). During her physical and during subsequent visits on January 28, 2008, February 13, 2008, and February 22, 2008, plaintiff did not complain of pain. However, during her March 27, 2008 visit, she complained of right hip pain. (R. 598). In his notes from plaintiff's April 2008 visit, Dr. Anklesaria concluded that plaintiff's diabetes was uncontrolled. Dr. Anklesaria also discussed the results of an x-ray of plaintiff's right hip. (R. 595). Plaintiff continued to visit Dr. Anklesaria for various problems such as a persistent cough and requests for birth control, through January 2009, but she received no treatment for any of the impairments that she claims impact her ability to work. (R. 586-594).

On August 26, 2007, Ms. Braddick completed a treatment plan for plaintiff. The plan indicates that plaintiff wants to work on her depressed mood, parenting skills, housekeeping skills, and interpersonal skills. (R. 689-700). Updated treatment plans dated February 22, 2008 and September 3, 2008 reveal plaintiff made "minimal to moderate" progress on her goals. (R. 564-573, 681-688).

On February 6, 2008, plaintiff saw R. Clio Robertson, M.D. of Central States Orthopedic on referral from Dr. Anklesaria. She informed Dr. Robertson that she injured her left knee in the September 29, 2004 motor vehicle accident. Dr. Robertson referred plaintiff to a physical therapist. (R. 583).

A few months later, on May 15, 2008, plaintiff saw Brian Graham, P.A.-C of The Orthopedic Center with initial complaints of right hip and thigh pain. (R. 555-57). Mr. Graham

performed a physical examination. Plaintiff denied having any headaches, and the examination revealed a normal gait without assistance. Plaintiff was also able to rise from a seated position without limitation or pain, although plaintiff did experience pain in her hamstrings. (R. 556). Mr. Graham noted "good alignment" of her spine, "normal stability," "no scoliosis or increased lordosis or kyphosis noted," "mild tenderness to deep palpitation over the right hip," "+5 motor strength to gastrocnemius, extensor halluces longus, quadriceps and hamstrings bilaterally with normal sensation in the bilateral lower extremities." Id. Plaintiff's straight leg raise testing was negative bilaterally in the seated position, no pain was noted with rotation of her hips, a Patrick's test was negative, she enjoyed a full range of motion in both knees without limitation or pain, and her ankle possessed full range of motion. Id. Mr. Graham's impressions were "lower back pain with radiculopathy; degenerative disk [sic] disease of the lumbar spine." Id. Mr. Graham recommended an MRI "to further evaluate her disk [sic] space and possible nerve root entrapment at L5-S1…." (R. 556). The MRI was performed on May 28, 2008.[11] (R. 558).

On June 26, 2008, Ms. Braddick wrote a letter on plaintiff's behalf requesting that she be allowed to file her reconsideration appeal out of time. The letter details a diagnosis of bi-polar disorder, which the letter explains can cause concentration problems, forgetfulness, and attention difficulties. (R. 541). Ms. Braddick stated plaintiff had difficulty "getting her mood regulated with medications," and difficulty managing her activities of daily living. Id.

Plaintiff returned to Dr. Robertson on August 15, 2008, again complaining of left knee pain. (R. 580-81). She told Dr. Robertson she was unable to utilize physical therapy due to her insurance, but that her pain had improved using glucosamine, chondroitin sulfate, and flax seed oil. (R. 580). She reported injuring her knee again while dancing at her brother's wedding two weeks prior to her visit. Id. Dr. Robertson ordered another MRI of plaintiff's knee, which

---

[11] There are no indications in the record that the results of this MRI were analyzed until August, 2008. See infra. at 17.

revealed "a rupture of anterior cruciate ligament as well as chondromalacia of the central aspect of the patella. There is moderate effusion but the menisci appear stable and the PCL is normal." (R. 579). Dr. Robertson discussed both surgical and non-surgical treatment options, and plaintiff wanted to proceed with surgery, which was performed October 2, 2008 with no complications. (R. 577-579). During a post-operative check up on November 14, 2008, plaintiff reported she was unable to attend physical therapy due to a lack of transportation, but was able to exercise at home. Dr. Robertson noted that plaintiff discontinued the use of her brace due to swelling, was progressing well, and could flex her knee from zero to 120 degrees. (R. 575). Plaintiff was directed to continue her home exercise program and avoid any stressful activity on her left knee for a year. Id.

On August 21, 2008, plaintiff returned to Mr. Graham, complaining of low back pain. Plaintiff told Mr. Graham her hip was "feeling much better" but complained of back pain with numbness and tingling in her feet. Mr. Graham reviewed the May 28, 2008 MRI results, which showed minimal degenerative disc disease of the lower lumbar spine at L4-5, left paracentral annular disc bulge at L1-2, and focal central annular disc bulge at L4-5. He assessed plaintiff with low back pain with radiculitis, herniated nucleus pulposus at L4-5, and degenerative disc disease. (R. 553). Mr. Graham proposed conservative treatment with a lumbar corset, lumbar epidural steroid injections at L4-5, and physical therapy.

With regard to plaintiff's mental health, she continued to see Ms. Braddick, whose notes from September 2008 to February 2009 generally show that plaintiff's sessions yielded "provisional" or "moderate" progress toward her goals with plaintiff's mood identified as "good." (R. 609-626).

On September 5, 2008, plaintiff returned to the Orthopaedic Center and saw Andrew R. Briggeman, D.O. He noted that plaintiff had a "mildly antalgic gait pattern," and rose from a

seated position "somewhat gingerly." (R. 551). A straight leg raise test was positive on the right side, and Dr. Briggeman noted tenderness with facet loading and forward bending in the lumbosacral region. (R. 551). His assessment was "degenerative lumbar spondylosis with right greater than left lower extremity radiculopathy; history of migraine headaches; lumbar myofascitis; [and] chronic pain syndrome." Id. Dr. Briggeman adjusted plaintiff's medications and gave her a steroid injection. (R. 552).

Plaintiff returned to Dr. Briggeman on November 7, 2008, with "chronic low back pain" as her chief complaint. (R. 549). Plaintiff's deep tendon reflexes were "symmetric with no upper tract signs," and straight leg raise testing was positive on the right. Id. Dr. Briggeman gave her another epidural steroid injection, refilled her medication, and advised her to "remain active on a daily basis and continue home exercise program as previous." (R. 550). Plaintiff informed Dr. Briggeman on December 8, 2008 that her pain was "doing quite well" that day and she felt she did not need another injection. Dr. Briggeman advised plaintiff to continue to be active daily and continue her home exercise program. (R. 547).

On February 6, 2009, plaintiff again saw Dr. Briggeman. He noted trace deep tendon reflexes in plaintiff's ankles, "1+/4" deep tendon reflexes at her knees, and positive straight leg raise test on the right. (R. 545). He directed plaintiff to continue her current medications, "remain active on a daily basis and continue home exercise program as previous." (R. 546). He also gave plaintiff another epidural injection. (R. 545-46).

Despite Ms. Braddick's view that plaintiff was making progress with her mental health issues, on February 17, 2009, plaintiff saw Dr. David Shadid, D.O., of Psychiatric Associates of Tulsa, for a second opinion regarding her depression, bi-polar disorder, anxiety, PTSD, OCD, and ADHD. (R. 606-07). Dr. Shadid noted plaintiff's past history of substance abuse, her current

use of tobacco, and her statement that she was not using alcohol. (R. 606). He assessed her with a GAF score of 55.[12] (R. 607).

On March 2, 2009, plaintiff saw Dr. Briggeman again with complaints of "chronic low back and bilateral lower extremity pain." (R. 651). On physical examination, Dr. Briggeman found plaintiff's deep tendon reflexes were "symmetric with no upper tract signs," "… tenderness with facet loading and forward bending in the lumbosacral region and negative straight leg raise," but "sensation and strength" were intact. Id. His treatment plan included one refill of her medication, continuation of her home exercise program, and cancellation of her next appointment "if her back and legs are still doing quite well." (R. 651-52).

On March 3, 2009, plaintiff returned to Dr. Shadid. (R. 732). Dr. Shadid's Axis diagnosis was: Axis I, bipolar disorder, by history, post-traumatic stress disorder, obsessive-compulsive disorder, rule out attention deficit hyperactivity disorder, polysubstance drug abuse, rule out, by history; Axis II, none; Axis III, diabetes, back pain, and migraines; Axis IV, problems with relationships; and Axis V, GAF current 60, past year 60. (R. 732). Dr. Shadid's treatment plan for plaintiff included continuing her current medications, "check ADHD forms," possibly introduce Vyvanse (prescription for ADHD), and continue her therapy. Id.

Ten days later, plaintiff decided to discontinue care with Ms. Braddick. Plaintiff wrote on her discharge form that "[she] didn't feel like [she] was getting the proper care from the psychiatrist and for other person [sic] reason's. [sic]" (R. 680).

Plaintiff then returned to Dr. Shadid on March 31, 2009. Her subjective complaints included problems focusing, low productivity, sleep disturbances, low appetite, racing thoughts, and emotional outbursts. She complained to Dr. Shadid that she had "tried a small amount of [her] son's Adderall and noticed a big change [in her] moods," which included more frequent

---

[12] It is difficult to tell exactly what the score is; it could be either 55 or 65. The entry appears to have been written over. The ALJ accepted the entry as 55. (R. 27).

emotional outbursts and yelling. (R. 731). Dr. Shadid assessed her with bi-polar disorder by history, PTSD, OCD, polysubstance abuse by history, and ADHD. He increased her Abilify prescription, advised her to continue her remaining medications, and added Vyvanse. Id.

Plaintiff returned to Dr. Briggeman on April 27, 2009 with "increasing pain in the low back." Dr. Briggeman again noted that plaintiff ambulated with an antalgic gait and "transfer[ed] gingerly from sitting to standing position." (R. 649). He also noted her deep tendon reflexes were "trace at the knees and ankles," but "sensation and strength [were] intact." Id. He prepared a letter to Dr. Anklesaria, stating: "[plaintiff] has degenerative lumbar spondylosis with lower extremity radiculopathy – very good relief from previous L4-5 epidural injections, lumbar myofascitis, [and] worsening debility secondary to pain." Id. He administered another epidural steroid injection. (R. 650). He authorized a refill of Neurontin, switched plaintiff to Roxicodone (for moderate to severe pain), recommended another MRI scan, gave her an injection of Toradol (an anti-inflammatory), gave her samples of Dolgic Plus for headache pain, and filled out her disability paperwork. Id.

Dr. Briggeman completed a Medical Source Opinion of Residual Functional Capacity form for plaintiff at her April 27, 2009 visit. He stated that plaintiff could sit and stand/walk for "2-3 hrs" at a time and lift 10 pounds. He indicated that plaintiff's obesity contributed to her difficulties with sitting and standing. Dr. Briggeman noted "decreased ankle jerk reflexes, decreased flexion/extension in lumbar spine, antalgic gait pattern," and "tautness/spasm at L1-5 bilaterally" as support for his findings. (R. 654). He also completed a temporary (issued for up to six months only) Handicapped Parking Placard Application form, stating she was unable to "walk 200 feet without stopping to rest," and that she was "severely limited in … her ability to walk due to an arthritic, neurological, or orthopedic condition." (R. 702). Dr. Briggeman also completed a Medical Source Opinion Reference Headache Disorder form. In the form, Dr.

Briggeman stated that plaintiff suffered three disabling headaches per week (or 15 per month), lasting more than four hours each with associated nausea, blurred vision, noise and light sensitivity, and vomiting. He stated plaintiff was prescribed Dolgic Plus for her headaches, and that she experienced side effects, including dizziness, insomnia, nausea, and poor concentration. (R. 654).

Two days later, plaintiff saw Dr. Shadid, who noted plaintiff's symptoms were improved and that she seemed to be thinking more clearly. He also noted plaintiff increased her dosage of Vyvanse on her own. (R. 729). Dr. Shadid completed a Medical Source Opinion of Ability to do Work-Related Activities (Mental) form during this visit. (R. 658-660). On the form, Dr. Shadid indicated that his opinions were "[e]stimates from limited interaction [with] no testing [at] this office [and] only 2 app[ointments]." (R. 658). He proceeded to rate plaintiff with moderate limitation in the areas of remembering locations and work-like procedures, understanding and remembering detailed instructions, interacting appropriately with the public, and working with others without causing distractions. (R. 658-59). The remaining categories were all rated with a marked limitation, except plaintiff's ability to understand and remember simple instructions, which was rated as a slight limitation. Id.

Plaintiff's MRI report from a May 8, 2009 scan ordered by Dr. Briggeman showed "early degenerative disk [sic] disease at L4-5," and "mild disk [sic] space narrowing with mild left paracentral posterior disk [sic] protrusion at L1-2." No further records from Dr. Briggeman analyze these MRI results. (R. 704).

On May 29, 2009, Ms. Braddick completed a Medical Source Opinion of Ability to do Work-Related Activities (Mental) form for plaintiff. (R. 706-08). She noted slight limitations in the ability to understand and remember simple instructions, and the ability to work with others without causing distractions; moderate limitations in the ability to understand and remember

detailed instructions, the ability to work close to others without being distracted, and the ability to interact appropriately with the public; and marked limitations in the ability to remember locations and work-like procedures, maintain attention and concentration for extended periods in order to perform detailed tasks, the ability to adhere to a schedule and maintain regular attendance, the ability to perform at a consistent pace without an unreasonable number or length of rest periods, the ability to handle normal work stress, and the ability to maintain socially appropriate behavior and basic standards of neatness and cleanliness. (R. 706-07).

Also on May 29, 2009, Ms. Braddick completed the same form as it related to plaintiff's condition prior to December 31, 2006. (R. 734-36). This form showed moderate limitations in all areas except two. Ms. Braddick noted marked limitation in plaintiff's ability to maintain attention and concentration for extended periods, and the ability to maintain socially appropriate behavior and basic standards of neatness and cleanliness. Id. On both forms, she concluded that plaintiff could manage any benefits awarded in her own best interest.

After plaintiff's June 8, 2009 hearing, the ALJ sent her back to Dr. LaGrand for an additional consultative examination, which took place on October 21, 2009. (R. 737-43). Dr. LaGrand noted her own prior diagnosis of bi-polar disorder, plaintiff's diagnosis of bi-polar disorder from Creoks, and that plaintiff reported "no history of substance abuse" to Creoks. (R. 737). Dr. LaGrand utilized the Minnesota Multiphasic Personality Inventory-2, a Mental Status Exam, Structured Inventory of Malingered Symptomatology (SIMS), and a brief clinical interview during plaintiff's examination. Id. Dr. LaGrand summarized plaintiff's complaints and noted that plaintiff reported being raped by two men in May of 2009.[13] Plaintiff reported suffering anxiety, and migraines "which occur up to 15 times a month and last up to three days at a time." (R. 738). Plaintiff also reported that she began treatment at Parkside Psychiatric Clinic

---

[13] This mention is the first indication in plaintiff's records of a rape.

with Dr. Verletta Russell in August 2009, and that she visited Dr. Shadid monthly for medication management. Id. She also claimed to be seen once a week at Shadow Mountain Outpatient Services for "parenting skills" and at DVIS for sexual assault counseling.[14] Id.

Dr. LaGrand noted plaintiff's reports of tobacco, alcohol, and illicit drug use, which began 21 years prior. Plaintiff stated she currently smoked a pack of cigarettes a day, drank alcohol "about three times a year," last smoked marijuana six months prior to the appointment, and last used amphetamines in July 2009. (R. 739). She also reported the loss of a job because she was using marijuana while working. Dr. LaGrand observed that plaintiff's substance abuse "has caused memory loss and overeating. In August 2009, she used more Adderall than what was prescribed for her and in 2008 she used Lortab for a migraine that was not prescribed for her." Id.

Dr. LaGrand stated that plaintiff's hygiene was appropriate, that she drove herself to the exam, and that she arrived on time. No physical handicaps were noticed, plaintiff's posture and gait were normal, and she was able to complete the tests on a computer with no apparent difficulty. (R. 740). However, plaintiff's test results were invalid "due to over-endorsement of atypical items," and Dr. LaGrand concluded that the results of the SIMS test indicated a "high likelihood of potential feigning, but is also seen when a claimant feels overwhelmed by life and is unable to meet the demands place [sic] on them." Id. Dr. LaGrand said plaintiff's "overall SIMS score was indicative of malingered symptomatology." Id. Plaintiff's IQ was estimated to be low average or above. Dr. LaGrand's final Axis diagnosis was: Axis I, polysubstance abuse/dependence, in partial full sustained remission; Axis II, borderline personality disorder (with avoidant and obsessive-compulsive traits); and Axis V, GAF of 45.

---

[14] The record does not contain any indication of records from Shadow Mountain, Parkside or additional records from DVIS.

Dr. LaGrand opined that plaintiff's memory skills, persistence and pace, and judgment all appeared adequate, and that her "ability to perform adequately in most job situations, handle the stress of a work setting and deal with supervisors or co-workers is estimated to be low average." (R. 742). Dr. LaGrand believed the results were a valid estimate of plaintiff's overall functioning, and that plaintiff could handle her own funds without assistance. (R. 742-43).

### Decision of the Administrative Law Judge

Plaintiff alleges her disabling impairments include "back pain, migraines, bi-polar, [and] arthritis." (R. 161). The ALJ determined that plaintiff was insured for Title II benefits through December 31, 2006. At step one of the five step sequential evaluation process, the ALJ found plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 6, 2006. The ALJ found plaintiff suffered the severe impairments of "degenerative disc disease of the lumbar spine, status post-left knee surgery, obesity, post traumatic stress disorder ('PTSD'), and borderline personality disorder" at step two. The ALJ found plaintiff's migraine headaches and history of substance abuse to be non-severe impairments. (R. 18). At step three, the ALJ stated that none of plaintiff's impairments met or equaled any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, with special focus on Listing 1.02, 1.04, 12.04, 12.06, and 12.08. (R. 19). He performed the "special technique" at step three to decide that plaintiff's mental impairments did not meet or equal listings 12.04, 12.06, or 12.08. (R. 19-20). Before moving to step four, the ALJ found plaintiff had the residual functional capacity ("RFC") to:

> … perform sedentary work as defined in 20 CFR 404.1567(b) and 416.967(b); i.e., the claimant can lift and carry ten pounds frequently and up to ten pounds occasionally, she can stand and walk at least two hours out of an eight hour workday, and sit at least six hours out of an eight hour workday. She is limited to simple, repetitive tasks, and should have only incidental contact with the public.

(R. 20-21). Relying on testimony from the vocational expert at, the ALJ determined plaintiff could not perform any of her past relevant work. At step five, again relying on testimony from

the vocational expert, the ALJ found jobs in significant numbers existed which plaintiff could perform, such as an assembler (DOT number 732.684.062), a miscellaneous laborer (DOT number 715.687.086), and an inspector-checker (DOT number 786.684.030). (R. 33-34). The ALJ then determined plaintiff had not been under a disability from January 1, 2006 through the date of his decision. (R. 34-35).

## Issues

Plaintiff's allegations of error are as follows:

1. The ALJ failed to properly consider the medical source opinions;

2. The ALJ failed to properly consider the plaintiff's credibility; and

3. The ALJ's RFC assessment is not supported by substantial evidence.

(Dkt. # 17 at 6).

## Discussion

## Medical source opinions

Plaintiff argues that the ALJ failed to properly consider the medical source opinions of Dr. Briggeman and Ms. Braddick. Specifically, plaintiff argues that the ALJ failed to give reasons for accepting part of Dr. Briggeman's April 27, 2009 opinion, but not all of it, and that he did not specify what facts contained in Ms. Braddick's opinions were not supported by the record.[15] Plaintiff also argues that the ALJ failed to give adequate reasons for accepting only parts of the opinions of Ms. Braddick, Dr. Shadid, and Dr. LaGrand. (Dkt. # 17 at 6-9).

---

[15] The undersigned finds no merit in plaintiff's additional argument that the "ALJ improperly removed standing combined with walking for the 2-3 hours." (Dkt. # 17 at 7). The ALJ's actual statement was as follows: "Moreover, Dr. Briggeman's opinion about the claimant's ability to walk for 2-3 hours in an eight hour workday conflicts with Dr. Briggeman's opinion expressed in Exhibit 35F [a handicap parking placard application] which says the claimant 'cannot walk 200 feet without stopping to rest…'." (R. 31). The ALJ was merely discussing the inconsistency between the two opinions.

Ordinarily, a treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Hackett, 395 F.3d at 1173-74 (citing Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003)). If the ALJ discounts or rejects a treating physician opinion, the ALJ is required to explain her reasoning for so doing. See Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987) (stating that an ALJ must give specific, legitimate reasons for disregarding a treating physician's opinion); Thomas v. Barnhart, 147 Fed.Appx. 755, 760 (10th Cir. 2005) (holding that an ALJ must give "adequate reasons" for rejecting an examining physician's opinion and adopting a non-examining physician's opinion).

In determining whether the opinion should be given controlling authority, the analysis is sequential. First, the ALJ must determine whether the opinion qualifies for "controlling weight," by determining whether it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and whether it is consistent with the other substantial evidence in the administrative record. Watkins, 350 F.3d at 1300. If the answer is "no" to the first part of the inquiry, then the analysis is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. Id. "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

However, even if the ALJ finds the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the record, treating physician opinions are still entitled to deference and must be evaluated in reference to the factors enumerated in 20 C.F.R. § 404.1527, and § 416.927. Those factors are:

26

> (1) the length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Watkins, 350 F.3d at 1301 (citing Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)). The ALJ must give good reasons in his decision for the weight he ultimately assigns the opinion. Id. (citing 20 C.F.R. § 404.1527(d)(2)). If the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so. Id. (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1990)). The reasons must be of sufficient specificity to make clear to any subsequent reviewers the weight the adjudicator gave to the treating physician's opinion and the reasons for that weight. Anderson v. Astrue, 319 Fed. Appx. 712, 717 (10th Cir. 2009) (unpublished).[16]

However, if a treating physician's opinion addresses an issue ordinarily reserved to the Commissioner, such as a claimant's ability to work or the ultimate question of disability, the ALJ may not give controlling weight to that opinion. See Butler v. Astrue, 410 Fed.Appx. 137, 142 (10th Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e), 416.927(e)) (unpublished). "[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p. The ALJ may not ignore those opinions but "must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record," using the factors set forth in 20 C.F.R. § 404.1527(d), and § 416.927(d), cited *supra*.

---

[16] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

The ALJ's opinion consists of 17 pages of well written explanations for his findings. (R. 18-35). In discussing plaintiff's RFC determination, the ALJ summarized plaintiff's extensive medical visits to her various providers, including Dr. Briggeman.[17]

Plaintiff argues that the ALJ did not offer adequate reasons for rejecting the sitting portion of Dr. Briggeman's opinion, while adopting the lifting and stand/walk restrictions. But the ALJ notes in his lengthy analysis of Dr. Briggeman's opinion that Dr. Briggeman failed to "indicate whether this 2-3 hour[]" limitation on plaintiff's ability to stand, walk, and sit, "is cumulative or between breaks." In addition, the ALJ notes that Dr. Briggeman's opinions on plaintiff's ability to stand, walk, and sit are based on plaintiff's "decreased 'ankle jerk reflexes,' 'decreased flexion/extension in the lumbar spine' and 'antaglic [sic] gait pattern,' as well as a '[illegible]' tautness spasm at L1-5 bilaterally." The ALJ pointed out that plaintiff's "'antalgic gait' appeared for the first time after she reported 'injuring her knee.'" (R. 31). The ALJ also pointed to discrepancies between Dr. Briggeman's actual treatment notes and his opinion, specifically that Dr. Briggeman's opinion that plaintiff could walk 2-3 hours of eight conflicts with his opinion that plaintiff "cannot walk 200 feet without stopping to rest (but is nevertheless able to operate a motor vehicle under normal or adverse driving conditions)." Id.

The ALJ also cited Dr. Briggeman's failure to explain why plaintiff's pain was first reported on the right side, then on the left side. (R. 31). The ALJ noted that Dr. Briggeman did not treat plaintiff's knee and that his notes do not contain any treatment, prognosis, or explanation for the "apparently newly observed 'decreased ankle jerk reflexes,'" or objective testing to determine plaintiff's "decreased flexion and extension in the [plaintiff's] lumbar spine." Id. The ALJ concluded:

---

[17] While the ALJ did not specifically call Dr. Briggeman a "treating physician," it is clear from a review of the ALJ's opinion that the ALJ completed the treating physician analysis for Dr. Briggeman's opinions.

> Due to the foregoing concerns about Dr. Briggeman's evaluation and observations, his opinion about the limitations of the claimant's ability to sit, stand, [and] walk are given little weight. Nevertheless, Dr. Briggeman's opinion about the claimant's ability to frequently lift weight of at [sic] ten pounds is given some weight as that opinion conforms to substantial medical evidence of record.

(R. 31).

It is clear from an additional notation in the ALJ's opinion that he adopted part of the State Disability Determination Service's RFC opinion regarding plaintiff's ability to sit and stand and/or walk throughout an eight hour workday. The ALJ gave that opinion "some weight," yet noted the opinion did not have the benefit of objective MRI findings supportive of plaintiff's subjective complaints of pain. (R. 32). The ALJ's findings in this regard make clear why the ALJ decided to limit plaintiff to standing and/or walking two hours during an eight hour day. Id.

For the foregoing reasons, the undersigned rejects plaintiff's argument regarding Dr. Briggeman's opinion and finds the ALJ's reasoning to be well supported by substantial evidence in the record.

Similarly, the undersigned finds the ALJ's treatment of Ms. Braddick's opinions to be well explained. The ALJ stated that he found the GAF scores given by Ms. Braddick to be less persuasive because she is a "non-physician and non-psychologist." Id. The ALJ noted earlier in his RFC discussion that plaintiff's "list of psychiatric complaints and psychotropic medications, as well as the list of pain medications, constitute additional support for the [RFC] that limits the claimant to simple repetitive tasks and incidental contact with the public. This [RFC] is further supported by a statement from Premadonna Braddick dated June 26, 2008, who suggests that the claimant should be limited to simple repetitive tasks." (R. 29). The ALJ accepted Ms. Braddick's statement as a "third party" and not as a medical source. Id. He also noted that Ms. Braddick's opinion that plaintiff's "condition has caused her problems with getting her mood regulated with medications" is "not supported by facts," and said that while he appreciated her opinion as a

third party, it was unclear how she arrived at her conclusion. (R. 32). The Court finds the ALJ's opinion in this regard to be well supported by the record.

As to the remainder of plaintiff's argument regarding Dr. Shadid and Dr. LaGrand, the undersigned finds no error in the ALJ's determination. The ALJ found that Dr. Shadid limited his own opinion by stating he had limited contact with plaintiff and that his opinion was based on estimation and no testing. Id. The ALJ thoroughly discussed his reasoning behind adopting Dr. Shadid's GAF scores over Dr. LaGrands. (R. 32). He stated that while each provider had limited contact with plaintiff, plaintiff had voluntarily sought out Dr. Shadid, and Dr. Shadid had more opportunity to "observe and evaluate" plaintiff than Dr. LaGrand. Therefore, he chose to adopt Dr. Shadid's higher GAF scores. Id.

Further, the ALJ noted the test results from Dr. LaGrand and the fact that she found a "strong indication of malingered symptoms," and reviewed the record as a whole to determine that her opinion regarding claimant's concentration had more weight than that of Dr. Shadid. (R. 28, 33).

**Credibility**

Plaintiff next argues that the ALJ failed to perform a proper credibility analysis. The Court finds to the contrary. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence. However, [f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quotation and citation omitted). The ALJ must "explain why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not credible." Id. The ALJ can look at objective factors, such as attempts to find relief, use of

medications, regular contact with doctors, and daily activities when determining a claimant's credibility. Luna v. Bowen, 834 F.2d 161, 165-66 (10th Cir. 1987).

Plaintiff claims that the ALJ did not give proper consideration to her testimony regarding her migraine headaches, which the ALJ found to be non-severe, and even alleges in her reply brief (dkt. # 19) that the Commissioner "did not give any argument supporting the ALJ's failure to address the plaintiff's migraine headaches. As such that error is unchallenged." The Court disagrees.

The Commissioner did offer a response to plaintiff's argument. (Dkt. # 18 at 6-7) (noting that the ALJ discussed the fact that Dr. Briggeman had no treatment records of or testing to diagnose plaintiff's headaches, only her subjective complaints of headaches). More importantly, the Court agrees with the Commissioner's statement that the "ALJ noted that Dr. Briggeman's medical report indicate [sic] only Plaintiff's self-report of a 'history of migraines' and do not document that [sic] alleged frequency or duration." Id. Dr. Briggeman did not perform any testing regarding plaintiff's headaches, and only prescribed medication for them on the visit during which he filled out his opinions. (R. 650).

As to the remaining credibility arguments, the Court finds that the ALJ tied his credibility findings to specific evidence. The ALJ thoroughly analyzed plaintiff's subjective complaints. He noted that plaintiff was "less than forthcoming in testimony about her care for her children," noting her sister and neighbors helped her with the children, and that the children basically watch themselves. He found these statements inconsistent with claims to plaintiff's mental consultative examiners that she had no friends and isolated herself. (R. 29). He also noted a lack of consistency in plaintiff's statements that she changed her medication amounts without direction from any physician, took medications not prescribed for her, and took medication that previously had not worked for her. The ALJ noted the sheer number of providers plaintiff consulted, instead

of returning to any one physician who knew her prior history, contributed to the overall complication of her records. He pointed out that it is unclear which physician prescribed what medication, and what medications plaintiff actually takes. Id. The ALJ pointed to examples of plaintiff reporting only taking one psychiatric medication during a consultative examination, then only two months later, reporting taking at least four different psychiatric medications to Laureate Psychiatric Hospital. Id.

The ALJ mentioned plaintiff's inconsistencies in the reporting of her physical symptoms; right leg pain, then left leg pain; and that plaintiff's favorable reports regarding more conservative pain management options diminished if she could obtain narcotic pain relievers. (R. 30). The ALJ also noted that while plaintiff's reported symptoms increased, these claims were inconsistent with her treatment history, and the objective medical evidence does not supported her claims. His reasoning is that if plaintiff's symptoms were truly as severe as reported, she would have sought more consistent treatment. Id.

In light of the deference afforded the ALJ on the issue of credibility and the fact that the ALJ did cite to specific evidence which could fairly be interpreted as creating a credibility issue, the Court finds the ALJ's credibility determination to be supported by substantial evidence.

**RFC determination**

Finally, plaintiff argues that the ALJ "failed to explain how the evidence supports his finding and his RFC assessment is not supported by substantial evidence." (Dkt. # 17 at 13). The Court disagrees.

The ALJ's opinion is thorough and thoughtful. He states several times throughout his decision that he carefully considered the entire record. The Tenth Circuit has held that its general practice "is to take a lower tribunal at its word when it declares that it has considered a matter." Hackett, 395 F.3d. at 1173. The ALJ detailed his reasoning very clearly. Plaintiff's argument that

the ALJ chose only those opinions that would support his RFC is unfounded. The Court agrees with the Commissioner's argument that the only opinions plaintiff cites as contradicting anything in the ALJ's RFC assessment are those of Ms. Braddick. As noted *supra*, the ALJ properly considered Ms. Braddick's opinions and statements as from a non-medical source. Plaintiff also claims "[t]here are no medical opinions that support the ALJ's RFC assessment." This argument is, likewise, unfounded. The ALJ gave plaintiff greater limitations than the agency RFC assessments in the record, which found plaintiff could sit six hours out of eight, and stand and/or walk six hours out of eight. The ALJ's RFC assessment shows he afforded some merit to plaintiff's subjective complaints of pain, and incorporated them into her RFC. The undersigned finds no error.

## Conclusion

The decision of the Commissioner finding plaintiff not disabled is AFFIRMED.

SO ORDERED this 27th day of March, 2013.

T. Lane Wilson
United States Magistrate Judge